Filed 8/7/13  In re A.F. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.F., <br><br> a Person Coming Under the Juvenile Court Law. | B243058 <br> (Los Angeles County <br> Super. Ct. No. CK91573) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff, Respondent and Cross-Appellant, <br><br> v. <br><br> S.J., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert L. Stevenson, Juvenile Court Referee.  Reversed in part and affirmed in part.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff, Respondent and Cross-Appellant.

## INTRODUCTION

Mother, S.J. (Mother), appeals from a dependency court order declaring her minor son, A.F., a dependent of the court under Welfare and Institutions Code section 300 (section 300), subdivision (b). Mother contends there is no substantial evidence that A.F. is at substantial risk of suffering serious physical harm such that dependency jurisdiction is appropriate under section 300, subdivision (b). We agree and reverse the order finding dependency jurisdiction over A.F. on that ground.

The Los Angeles County Department of Children and Family Services (DCFS) cross-appeals from the judgment, contending that the dependency court erred in failing to find jurisdiction pursuant to section 300, subdivision (c), based on severe emotional damage to A.F. Because the evidence below with respect to emotional abuse was contradictory, we affirm the order dismissing the allegation under section 300, subdivision (c).

## FACTUAL AND PROCEDURAL BACKGROUND

*Procedural Background*

A dependency petition was filed on January 26, 2012, alleging that A.F., a boy born February 1999, came within the provisions of subdivisions (b) and (c) of section 300.[1]

Under section 300, subdivision (b), the petition alleged that on prior occasions, A.F. demonstrated homicidal ideation against Mother and his grandmother, M.J. (Grandmother), resulting in his hospitalization in a psychiatric

---

[1] The petition also alleged that A.F.'s younger sister, Y.G., was a child described by section 300, but ultimately such allegations were dismissed and Y.G. is not a party to this appeal. A.F.'s father, who lives in Mexico, is also not a party to this appeal.

facility. The petition further alleges that Mother "failed to ensure the child's participation in necessary mental health treatment and that the child complied with the child's prescribed psychotropic medication regime," and that this medical neglect endangered his physical health and safety and placed him "at risk of physical harm, damage, danger and medical neglect."

Under section 300, subdivision (c), the petition alleged that Mother and Grandmother emotionally abused A.F. on an ongoing basis by calling him demeaning and derogatory names and questioning his sexual orientation, and by cutting his hair against his will while he was sleeping. The petition alleged that the child exhibited homicidal ideation against Mother and Grandmother resulting in his hospitalization. The petition alleged that the ongoing emotional abuse by Mother and her failure to protect A.F. from abuse by Grandmother, places him at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal, and aggressive behavior towards himself or others.

The court found a prima facie case existed for detaining A.F. and for finding that he was a person described by subdivisions (b) and (c) of section 300. A.F. was released to Mother's custody, and the court ordered a mental health assessment for him and family maintenance services for him and Mother.

At the adjudication and disposition hearing, the court found that A.F. has severe mental health issues, and that Mother has not timely or adequately addressed these issues or ensured that A.F. received the services he needed. The court further concluded that Grandmother "creates quite a toxic environment" for A.F. The court sustained the allegation under section 300, subdivision (b), but dismissed the allegation under subdivision (c) on the ground that DCFS had not satisfied its burden.

3

Mother appealed from the jurisdictional/dispositional order finding jurisdiction under section 300, subdivision (b), and DCFS cross-appealed, challenging the dependency court's dismissal of the allegation under section 300, subdivision (c).

*Factual Background*

1.  *Previous Allegations*

A.F. was the subject of nine referrals to DCFS between July 2006 and November 2011 for emotional and or physical abuse by Mother and Grandmother, who lived with the family. Besides the November 2011 report that gave rise to the dependency petition on which the instant appeal is based, all the prior allegations were deemed unfounded or inconclusive except one September 18, 2009 report of physical abuse by Grandmother. On that occasion, A.F. alleged that Grandmother had hit him with a stick that morning and reported that she would sometimes slap his face or hit him with coat hangers and other objects. Grandmother admitted hitting A.F. in the past, and A.F.'s younger sister confirmed that her brother got hit with a hanger. During the 2009 investigation, A.F. admitted to grabbing a knife on one occasion, but stated he did not want to hurt anyone, and just wanted attention. Grandmother later stated that she believes A.F. brandished the knife while under some sort of spell or hoax placed on him by the neighbors.

The family agreed to a Voluntary Family Maintenance plan in place from September 2009 to November 2010, but DCFS did not begin working with the family until March 2010, after another incident in February 2010 when A.F. was hospitalized after stating that he wanted to kill Grandmother because she sold his videogame system. Two days earlier, he had threatened to put Mother in a wheelchair. At that time, he had been suspended from school twice and engaged in

4

disruptive behavior and displayed poor impulse control at school. A mandated reporter stated that the school had repeatedly referred A.F. for counseling and Mother failed to follow through, negated everything, and stated A.F. was fine.

A.F. admitted saying he was going to kill Grandmother but insisted he did not really mean it. He denied feeling depressed. A.F. was diagnosed with Disruptive Behavior Disorder Not Otherwise Specified and Impulse Control Disorder, Not Otherwise Specified. He was directed to follow up with mental health services and was prescribed Clonidine for hyperactivity and poor impulse control, and Abilify for mood swings, irritability, aggression, hostility, and paranoid grandiose ideations. His prognosis was listed as fair to good with treatment, but poor without treatment. During the first five months, A.F. was cooperative with treatment, but during August and October 2010 he refused therapy and medication and was verbally aggressive towards Grandmother. He was referred to Full Service Partnership services (FSP), but it is unknown whether he participated in these services. Mother was referred for counseling and parenting classes, but she refused to participate with FSP or any other services.

When interviewed about the February 2010 incident on February 21, 2012, A.F. stated that he did not like taking the medication prescribed for him because it made him sleepy. He said the doctor told Mother that he did not need it anymore. Mother also stated that the medication made him too drowsy and that the psychiatrist told her he could stop. She also reported that the psychiatrist told her that A.F. does not have mental health problems, but just does not like to follow rules.

5

2. *November 2011 Referral and Ensuing Investigation*

A mandatory reporter alleged on November 1, 2011 that Grandmother and A.F.'s stepfather, G.N. (Stepfather), were emotionally abusing A.F., and Grandmother was physically abusing him. Grandmother reportedly hit A.F. with clothes hangers and called him "gay, crazy, and retarded." A DCFS caseworker added allegations of emotional abuse and general neglect by Mother.

An emergency caseworker visited the family's apartment on November 3, 2011 and found it clean, but she noted a large, six-foot shrine to a saint in the living room area containing beer cans, candles, and idols. Mother, Grandmother, and Stepfather all denied the allegations of abuse and denied calling A.F. derogatory names. Mother said that when A.F. does not listen to her, she threatens to call law enforcement to report his misconduct in the home, and at times has called the police to have them speak to her son. Mother stated that she and her family have always been falsely accused of mistreating the children, and she and Grandmother stated they were tired of having social workers in their home. Mother explained that A.F. would be receiving counseling in school for his school behaviors. She refused all other services mentioned by the caseworker and would not let A.F. be medically examined, but indicated that A.F. had just received a physical examination on October 27, 2011 and the physician said he was healthy.

A.F. denied current physical or emotional abuse, but stated that Grandmother used to hit him with sandals, belts, and hangers and called him "gay, crazy, and retarded." His younger sibling Y.G. denied any abuse of A.F.

When the caseworker returned to the home to interview Stepfather, Grandmother opened the door and said the caseworker had no business returning there. Mother said the visit was unnecessary as they knew who the reporting party was and would be handling all matters with them. Stepfather denied any abuse of

6

the children and said no one in the home uses inappropriate language. When the caseworker tried to speak to the children, Grandmother yelled at her, told her they did not have time to talk about false allegations, and told her to leave the home. When the caseworker left, Grandmother slammed the door.

The caseworker spoke to Sylvia Navarro, the psychiatric social worker at A.F.'s middle school, who stated she had known A.F. and his family for a couple of years. She explained that A.F. had longstanding behavioral issues, including being disrespectful to teachers and acting out in class. She had never seen any marks or bruises on A.F., but knew there was name-calling in the home. A.F. had reported that Mother and Grandmother said the dog was better-behaved than him, and Mother threatened that A.F. would go to jail if he did not behave. Mother had asked Ms. Navarro to tell A.F. that if he does not behave, he is going to jail. Mother had a history of coming to the office to seek help for her son, but she never followed through with the recommendations given to her and would not accept the therapeutic services offered to A.F. She also invited Mother to participate in a parenting program, but Mother attended only one session. Mother subsequently denied that Ms. Navarro had referred her to a parenting class.

On January 18, 2012, the caseworker interviewed A.F. in private at his school. He explained that the name-calling had started again, and that Grandmother called him "gay" because he was letting his hair grow out. This made him angry and he would leave the home with his skateboard to avoid problems. He alleged that Grandmother and Mother had cut his hair while he was sleeping. He later corrected the story and said Grandmother, who reportedly practices Santeria, had put a sticky spray in his hair as part of her witchcraft. As a result, he had to get his hair fixed at the barbershop, where Grandmother took the razor from the barber and buzzed all his hair off much shorter than he wanted.) He

also said that he often argues with Grandmother because she cares for "her saints" more than him; for instance, she would not let him play electric guitar at home or go outside because this would disturb the saints. A.F. denied any current thoughts of wanting to hurt himself or others.

In a February 21, 2012 interview, A.F. again stated that Grandmother called him gay, and said he must be "doing favors" for a friend who gave him money to buy junk food at the store. These comments made A.F. "really mad." Also, Mother and Grandmother would tell him that his father, who lived in Mexico, was gay, which upset A.F. He again denied any current suicidal or homicidal thoughts. He stated that two months earlier he had gotten in a fight at school with a "really big" eighth-grader, which made Mother and Grandmother "scared" because they realize he had gotten much stronger.

On February 21, 2012, Mother indicated her belief that A.F. needed treatment due to his ongoing behavioral issues, but she thought A.F.'s main problem was that he wanted to rebel and do whatever he wants. She had scheduled a psychiatric appointment for the following month. (On March 6, 2012, DCFS confirmed that A.F. was scheduled to be seen for a psychological evaluation.) Grandmother stated her opinion that A.F. needs help and should be on medication. She denied cutting A.F.'s hair. A.F.'s younger sister said that A.F. would get mad and curse at Mother and Grandmother, that he hated them, and he had once told her he wanted to "break their heads." She stated that everyone treated A.F. well and did not yell at him. Stepfather also said the family does not call him derogatory names. He said no one can control A.F., who yells frequently and gets violent; he had hit Mother and Grandmother a few times. Although Stepfather thought A.F. was "mostly a good kid" and was not presently a danger to anyone in the home, he worried that as A.F. gets older he would get even more out of control. Stepfather

wanted A.F. to get help so that it did not "get to the point where he does something worse."

A July 23, 2012 Last Minute Information report indicated that DCFS had received two more referrals, dated April 25, 2012 and May 22, 2012, alleging abuse of A.F. An allegation of emotional abuse by Mother that was the subject of the first referral was deemed substantiated, but the other allegations were deemed unfounded.

The Last Minute Information also stated that according to Mother, A.F. had missed some mental health appointments in March and April 2012 because he refused to go and Mother felt physically threatened by him. However, A.F. had received school-based therapy services in June 2012 until those services ended because A.F. began FSP services. The FSP team recommended that A.F. have a mental health assessment, family therapy, and parenting classes for Mother and Grandmother. A.F. was reportedly in the process of receiving a psychiatric assessment and Mother stated she was scheduled to begin parenting classes soon.

Mother had been "somewhat cooperative" in allowing A.F. to receive medical attention and counseling services but had not been fully cooperative with DCFS. On multiple occasions, she failed to show up for scheduled appointments to discuss issues in the case. On one occasion, the DCFS dependency investigator called Mother to confirm she was going to show up for a scheduled appointment, and Grandmother told her that Mother was not at home because she had gone to the hospital due to nerves and back pain. The investigator made an unannounced visit to the home shortly thereafter and Mother answered the door, laughing, and said she did not know why Grandmother had said she was not home. When the investigator asked why she was not being cooperative and making her children available to the investigator, Mother said, " I don't care. I don't care. You can talk

9

to my attorney if you want because I don't care.  I was told that it was up to me if I want [A.F.] to receive services and if I don't feel like it, I don't have to make him available; none of that was ordered."

A.F. indicated that Mother and Grandmother were no longer hitting him because he had learned to hit back, but they still constantly verbally abused him. Grandmother would call him "retarded" and "useless."  A.F. said he wanted both Mother and Grandmother to receive parenting counseling and to leave him alone. "I'm behaving now and I listen, but they still treat me the same way.  It's just verbal abuse.  Sometimes when I'm really mad, I don't know what to do and I feel like these four corners come at me and it gets smaller and smaller and I feel like I'm going to erupt.  I don't want to hurt anybody, but I don't know what to do.  I end up yelling into my pillow and punch the pillows because I'm so mad.  I want them to stop embarrassing me in public.  They scold me in public and in front of my friends too.  I just want them to get some help!"

On one occasion in July 2012, Mother told DCFS she no longer wanted to care for A.F. as he continued to misbehave and she would consider giving him up for adoption or sending him to a foster home.  She then said she does not want to send A.F. away permanently, but she would like the court to consider sending him to a boot camp where he could learn to behave better.

## DISCUSSION

In order to assert jurisdiction over a minor, the juvenile court must find that he or she falls within one or more of the categories specified in section 300.  (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)  DCFS bears the burden of proving by a preponderance of the evidence that the minor comes under the juvenile court's jurisdiction.  (*Ibid.*)  "On appeal from an order making jurisdictional findings, we

10

must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value." (*Ibid*.) "A mere 'scintilla' of evidence is not enough. [Citation.]" (*In re B.T.* (2011) 193 Cal.App.4th 685, 691.) Any inferences we draw must be reasonable and logical; "'inferences that are the result of mere speculation or conjecture cannot support a finding [citations].' [Citation.]" (*Ibid.*)

*Section 300, subdivision (b)*

Dependency jurisdiction may be asserted under section 300, subdivision (b) where DCFS establishes that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).)

A jurisdictional finding under section 300, subdivision (b), thus requires: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) serious physical harm or illness to the child, or a substantial risk of such harm or illness. (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) "While

11

evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, italics omitted.) "Thus previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.)

DCFS contends that jurisdiction is justified under section 300, subdivision (b) because "[t]his is a case of a child in severe emotional pain, and Mother had not followed through with appropriate treatment." However, under section 300, subdivision (b), *emotional* harm is not sufficient to assert jurisdiction. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 718.)

Accordingly, we focus solely on whether DCFS has proffered substantial evidence that "at the time of the jurisdictional hearing the child is at substantial risk of *serious physical* harm in the future." (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396, italics added.) Despite the evidence that Grandmother hit A.F. was hit with clothes hangers, belts, shoes, and other objects in the past, by the time of the jurisdictional hearing, A.F. consistently denied any ongoing physical abuse, because he claimed that Grandmother and Mother were scared now that he had gotten stronger and had learned how to hit back. No evidence was presented of a substantial risk of serious physical harm at the hands of Grandmother.

Nor did DCFS present substantial evidence that A.F. was at risk of serious physical harm based on Mother's failure to ensure that he complied with a mental health regimen of therapy and medication. The record contains no evidence that A.F. has ever had thoughts of harming himself or that his mental health problems endangered his physical health. He always denied feelings of depression. He was

12

hospitalized for homicidal ideations directed at Mother and Grandmother, but such aggression towards others does not form a basis for jurisdiction under section 300, subdivision (b).

We conclude that there is no substantial evidence that A.F. is at substantial risk of suffering serious physical harm such that dependency jurisdiction is appropriate under section 300, subdivision (b). We therefore reverse the order finding dependency jurisdiction over A.F. on that basis.

*Section 300, subdivision (c)*

DCFS challenges the dependency court's determination that DCFS did not satisfy its burden to prove the allegation under section 300, subdivision (c), based on emotional harm suffered by A.F. Because the issue on appeal turns on whether DCFS met its burden of proof, the question for this court is whether the evidence compels a finding in favor of DCFS as a matter of law, that is, whether DCFS's evidence was "'uncontradicted and unimpeached'" and "'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Section 300, subdivision (c) provides for dependency court jurisdiction when "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." "The statute thus sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the

13

parent or parents are unable themselves to provide adequate mental health treatment." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557; see *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1136, fn. 11.)

In its petition seeking dependency jurisdiction under section 300, subdivision (c), DCFS alleged only that A.F. suffered emotional damage as a result of the conduct of his parent, and did not allege that he had no parent capable of providing appropriate mental health care.[2] Therefore, we focus solely on whether DCFS established the following three elements: "(1) serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior or a substantial risk of severe emotional harm if jurisdiction is not assumed; (2) offending parental conduct; and (3) causation." (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379; see *In re Alexander K., supra*, 14 Cal.App.4th at p. 557.)

The dependency court found that A.F. was suffering from "severe mental health issues" and had been "crying out." The record demonstrates that he was hospitalized in 2010 for homicidal ideation against Mother and Grandmother, and on several other occasions had threatened to harm them. Uncontradicted evidence demonstrates that A.F. continued to feel rage towards them as of the time of the jurisdictional hearing, as A.F. told DCFS in July 2012, "I feel like I'm going to erupt. I don't want to hurt anybody, but I don't know what to do. I end up yelling into my pillow and punch the pillows because I'm so mad." The record suggests that his aggressive behavior towards Mother and Grandmother continued in 2012

---

[2] On appeal, DCFS argues that the dependency court should have sustained the allegation under section 300, subdivision (c) because it found that Mother had failed to provide appropriate mental health treatment. However, DCFS does not acknowledge the limited grounds on which it sought jurisdiction under subdivision (c). Due process considerations restrain us from sustaining dependency jurisdiction on statutory grounds that were not alleged before the dependency court.

and that Stepfather worried he would become more dangerous as he got older. No evidence contradicted the evidence proffered by DCFS showing that A.F. suffered serious emotional damage, manifested by his aggressive behavior towards his family members.

However, the more problematic issue here is whether Mother's alleged emotional abuse of A.F., and her failure to protect A.F. from Grandmother's emotional abuse, caused A.F.'s emotional problems. There is ample evidence in the record suggesting that Mother and Grandmother emotionally abused him. Had the dependency court sustained the allegation under section 300, subdivision (c), we would have had little difficulty concluding that DCFS had proffered substantial evidence of emotional abuse. However, as discussed above, because the court dismissed the petition, and DCFS bore the burden of proof, the question on appeal is whether the evidence of emotional abuse by Mother was "'uncontradicted and unimpeached.'" (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.) As Mother points out, there was contradictory evidence in the record with respect to whether she and Grandmother called A.F. derogatory names and abused him emotionally, with Mother, Grandmother, Stepfather, and A.F.'s little sister denying such mistreatment. Given the conflicting evidence, we cannot find that the only reasonable conclusion was that Mother's treatment of A.F. or her failure to protect him was the cause of his emotional and psychological issues. Therefore, we affirm the order dismissing the allegation under section 300, subdivision (c).

## DISPOSITION

The order dismissing the allegation under section 300, subdivision (c) is affirmed.  The jurisdiction and disposition orders finding jurisdiction under section 300, subdivision (b) are reversed and the matter is remanded with directions that the juvenile court vacate those orders and issue new orders: (1) finding that A.F. is not a dependent child within its jurisdiction under section 300; and (2) dismissing the section 300 petition as to A.F.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:


MANELLA, J.


SUZUKAWA, J.


16